UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------- x
                  :
JENNIFER S. HANDAU         :        3:19 CV 616 (RMS)
                  :
V.                  :
                  :
ANDREW M. SAUL, COMMISSIONER  :
OF SOCIAL SECURITY[1]      :       DATE: JULY 23, 2020
                  :
-------------------------------------------------- x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION FOR JUDGMENT ON THE
PLEADINGS

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA" or "the Commissioner"]

denying the plaintiff disability insurance benefits ["DIB"].

I.      ADMINISTRATIVE PROCEEDINGS

The plaintiff filed her application for benefits on October 1, 2016, claiming that she had

been disabled since March 15, 2012, due to "bipolar 1," "features bipolar 2," "secondary

alcoholism in remission," "severe depression," "psychogenic dyssomnia," and "severe anemia."

(Certified Transcript of Administrative Proceedings, dated June 24, 2019 ["Tr."] 95-96). The

application was denied initially on January 26, 2017, (Tr. 95-105), and upon reconsideration on

July 25, 2017. (Tr. 107-121). On August 24, 2017, the plaintiff requested a hearing before an

Administrative Law Judge ["ALJ"]. (Tr. 143).

---

[1] The plaintiff commenced this action action against Nancy A. Berryhill, as Acting Commissioner of Social Security.  (Doc. No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A. Berryhill as the named defendant. *See* FED. R. CIV. 25(d).  The Clerk of the Court shall amend the caption in this case as indicated above.

On May 3, 2018, a hearing was held before ALJ Ronald J. Thomas, at which the plaintiff, Dr. Mark Spellmann, the plaintiff's therapist, and Mr. Robert Paterwic, a vocational expert ("VE"), testified. (Tr. 44-71). The plaintiff was represented by an attorney at the hearing. The ALJ subsequently issued an unfavorable decision on June 28, 2018, denying the plaintiff's claims for benefits. (Tr. 8-24). The plaintiff appealed to the Appeals Council, which, on February 25, 2019, denied the plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On April 24, 2019, the plaintiff filed her complaint in this pending action. (Doc. No. 1). The parties consented to the jurisdiction of a United States Magistrate Judge on June 6, 2019, and this case was transferred to the undersigned. (Doc. Nos. 7, 8). On June 24, 2019, the defendant filed the administrative transcript. (Doc. No. 9). On August 27, 2019, the plaintiff filed her Motion to Reverse the Decision of the Commissioner (Doc. No. 11 ["Pl.'s Mem."]).[2] On November 26, 2019, the defendant filed his Motion for Judgment on the Pleadings (Doc. No. 22 ["Def.'s Mem."]), with a Statement of Material Facts (Doc. No. 22-1).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 11) is DENIED, and the defendant's Motion for Judgment on the Pleadings (Doc. No. 22) is GRANTED.

---

[2] The Court's Scheduling Order directed the plaintiff to "file, as a separate document, a statement of material facts consisting of numbered paragraphs and supported by specific page citations to the Certified Administrative Record, as shall comply with the Standing Scheduling Order (Doc. Nos. 2 & 6) in this case." (Doc. No. 10). The plaintiff did not do so.

II.   FACTUAL BACKGROUND

A.   MEDICAL HISTORY

The Court presumes the parties' familiarity with the plaintiff's medical history, as detailed in their submissions. Though the Court has reviewed the entirety of the medical records, it cites only the portions of the record that are necessary to explain this decision.

B.   HEARING TESTIMONY

At the May 3, 2018 hearing, the plaintiff was 51 years old. (Tr. 47). She lived with her husband in New Fairfield, Connecticut. (Tr. 46-47). She had four "grown-up children." (Tr. 47). Her husband worked as a "physician assistant," but she had not worked since 2011. (Tr. 47-48). At that time, she worked for the City of Danbury as a nurse practitioner. (Tr. 48). She testified that she stopped working because she had a "neurological event," a "pseudo-stroke," which "killed [her] short term memory." (*Id.*). Previously, she worked at the Pediatric Medicine Center and the State of Connecticut John Dempsey Hospital as a nurse practitioner. (Tr. 49-50).

When asked what kept her from working since 2011, the plaintiff cited her bipolar disorder. (Tr. 50). She testified that her "moods [were] inconsistent" – that "[her] pattern [had] been two weeks a month with depression," one week where she would be "completely normal," and then "the next week [she would be] manic." (*Id.*). She explained that she "[has] had a difficult time trying to figure out how to work when [she] [has] to tell [potential employers] that [she] [would] not . . . be in for . . . two weeks out of a month." (*Id.*). She saw a psychiatrist and a therapist and took several medications for this condition. (Tr. 50-51). She stated that she had previously been admitted to the hospital for a suicide attempt; she also mentioned a second overnight admission but did not specify the reason for the admission. (Tr. 51). The ALJ asked whether she saw any

improvement from her medications; in response, the plaintiff stated that "[they are] still trying to get a nice mix to keep . . . my mood steady" because she "tend[ed] to swing quite a bit." (*Id.*).

The ALJ then asked about her physical impairments. (*Id.*). The plaintiff stated that she was treated for "a partially torn left Achilles" in February 2018. (*Id.*). She had initially torn her Achilles in 2015. (Tr. 57). She also mentioned that she "tend[ed] to relapse with anemia every couple of years." (Tr. 52). She testified that she could lift "25 [pounds] maybe" and could stand in one spot for a half an hour. (Tr. 52-53). She walked with a limp because of her recent surgery, and she had a cane at home. (*Id.*). She used the cane three times a week. (Tr. 57).

When asked about washing and dressing, the plaintiff stated that "it completely depends on the day." (Tr. 53). She explained that, if she was manic, she would "get up, get dressed and go out and spend a ton of money," but if she was depressed, she would "sit on the couch, not shower and watch TV for two or three days straight to the point where [her] husband [would] pick [her] up and throw[] [her] in the shower." (*Id.*). She stated that she tended to order out for her meals, or her husband would cook. (*Id.*). They paid someone to clean their home every two weeks. (*Id.*). She could drive, but did not drive much out of town, only within New Fairfield, Connecticut. (Tr. 47-48, 53). She did not do yard work or use public transportation. (Tr. 53-54). She did not have any hobbies, spending most of her time watching television, but she did travel with her husband to Phoenix to visit her son and Thailand to sightsee. (Tr. 54-55). The plaintiff also testified that she had problems with her memory; she explained, "It's still like Jello sometimes." (Tr. 56). She would forget about food she had put in the oven until the fire alarm went off, and she "d[id] strange things, like go[ing] grocery shopping and unload[ing] [the groceries] . . . into the oven." (Tr. 57).

The plaintiff's therapist, Dr. Mark Spellmann, also testified. Dr. Spellmann had been treating the plaintiff weekly since "the end of 2015." (Tr. 58). He explained that the plaintiff

suffered from bipolar disorder 2. (Tr. 59). Her depressions would last "anywhere from two to four weeks"; then she would have a week of normal mood or she would move into hypomania; hypomania would last a "week and a half or so" and was always followed by "severe depressions." (*Id.*). Dr. Spellmann opined that the plaintiff would be "disabled by her symptoms anywhere from three to four weeks a month, depending on the duration of the depression." (Tr. 60). According to Dr. Spellmann, "[a]t best, she [would] get[] a good week a month." (*Id.*). When asked whether Dr. Spellmann was aware of whether she accomplished household tasks, he responded: "When she's depressed, she hardly functions at all. When she's hypo-manic, she starts multiple projects, none of which she's able to focus on and finish and then maybe she gets a good week a month." (*Id.*). Dr. Spellmann also opined that medication was management, not a cure. (*See* Tr. 61 ("It doesn't stop the cycles. It keeps her out of the hospital.")). He also stated she was not capable of socializing when she was depressed, and not capable of listening when she was manic. (*Id.*).

Mr. Robert Paterwic, a VE, also testified. The VE categorized the plaintiff's past relevant work as a nurse practitioner as skilled work at the light exertional level. (Tr. 63). The ALJ asked the VE if a hypothetical individual, of the plaintiff's age, education and work experience, limited to the light exertional level, who was unable to stay on task for more than 80% of the time in the workplace, could perform the plaintiff's past relevant work. (Tr. 65). The VE responded that the hypothetical individual could not do so. (*Id.*). Moreover, such an individual would be "unemployable." (*Id.*). The ALJ then asked the VE to assume a hypothetical individual, of the plaintiff's age, education and work experience, limited to the light exertional level, but with the following additional limitations: 1) she could only occasionally twist, squat, bend, balance, kneel, crawl and climb; 2) she could not climb ropes, ladders or scaffolds; 3) she could not use left foot controls; 4) she must avoid hazards, such as dangerous machinery, heights and vibration, but she

could drive; and 5) she would be limited to simple routine repetitious work that required only occasional interaction with the public, coworkers and supervisors. (Tr. 65-66). The VE explained that such an individual would be unable to perform the past relevant work; however, he identified as other available occupations an electronics worker, with 30,000 to 40,000 jobs in the national economy, an "assembler, small products," with 50,000 to 60,000 jobs in the national economy, and a janitor, with 15,000 to 20,000 jobs in the national economy. (Tr. 66-67). The VE also testified that "most employers would only tolerate one excused absence per month." (Tr. 69).

III.    THE ALJ'S DECISION

The ALJ first dismissed the portion of the plaintiff's request for hearing relating to the period March 15, 2012 to August 28, 2014 due to *res judicata*. (Tr. 14, citing 20 C.F.R. §§ 404.957(c)(1) and 405.380(c)). In so doing, the ALJ noted that the plaintiff "previously filed an application for a period of disability and disability insurance benefits that was denied in a decision dated August 28, 2014," and that the plaintiff "filed a request for review with the Appeals Council and that request was denied on February 1, 2016." (Tr. 11). The ALJ "considered whether this decision should remain final and finds no reason why it should not." (*Id*.). The ALJ found that "no new and material evidence ha[d] been submitted and that there [had] been no change in statute, regulation, ruling or legal precedent concerning the facts and issues ruled upon in connection with the previously adjudicated period." (*Id*.). The ALJ thus found that "the [plaintiff's] rights on the same facts and on the same issues are involved and the doctrine of *res judicata* applies";  The ALJ then dismissed the portion of the plaintiff's request for hearing relating to March 15, 2012 through August 28, 2014 due to *res judicata*. (Tr. 12).[3]

---

[3] The plaintiff does not challenge this portion of the ALJ's decision.

Following the five-step evaluation process,[4] the ALJ then found that the plaintiff last met the insured status requirements of the Social Security Act on December 31, 2016, and that the plaintiff had not engaged in substantial gainful activity since March 15, 2012, her alleged onset date. (Tr. 14, citing 20 C.F.R. § 404.1571 *et seq.*).

At steps two and three, the ALJ concluded that the plaintiff had the severe impairments of bipolar disorder, alcohol abuse disorder, left Achilles tear, and obesity, (Tr. 14, citing 20 C.F.R. § 404.1520(c)), but that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15-16, citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). Specifically, the ALJ concluded that the plaintiff's left Achilles tear did not meet Listing 1.02, and that the plaintiff's mental impairments did not meet Listing 12.04. (*Id.*).

At step four, the ALJ found that, "[a]fter careful consideration of the entire record," the plaintiff had the residual functional capacity ["RFC"] to perform light work, as defined in 20 C.F.R. § 404.1567(b), but with the following limitations: she could occasionally bend, balance, twist, squat, knee, crawl and climb; she could not climb ladders, ropes or scaffolds; she could not use left foot controls; she needed to avoid hazards such as heights, vibrations and dangerous

---

[4] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, as a fifth step, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

machines, but she could drive; and she could perform "simple, routine, repetitive work that did not require teamwork or working closely with the public and [required] only occasional interaction with coworkers, supervisors and the public." (Tr. 17). The ALJ concluded that the plaintiff was not capable of performing her past relevant work. (Tr. 21, citing 20 C.F.R. § 404.1565).

Finally, at step five, the ALJ found that the plaintiff was 50 years old, a younger individual, on the date last insured, but subsequently changed age category to closely approaching advanced age. (Tr. 22 (citing 20 C.F.R. § 404.1563)). She had at least a high school education and could communicate in English. (*Id*. (citing 20 C.F.R. § 404.1564)). The ALJ found that transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that the plaintiff was not disabled, whether the plaintiff had transferable job skills. (*Id*. (citing SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)). The ALJ then concluded that the plaintiff could perform the jobs of electronics worker, assembler and janitor, each of which existed in significant numbers in the national economy. (Tr. 22-23 (citing 20 CFR § 404.1569 and 404.1569(a))). Accordingly, the ALJ found that the plaintiff was not under a disability at any time from March 15, 2012, the alleged onset date, through December 31, 2016, the date last insured. (Tr. 23).

IV.    STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal

error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Further, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    DISCUSSION

The plaintiff contends that the ALJ 1) incorrectly assessed the plaintiff's neurocognitive disorder as a nonsevere impairment; 2) failed to properly find that the plaintiff's impairments met or medically equaled the criteria of Listings 12.02 and 12.04; 3) afforded improper weight to Dr. Mark Spellman's opinion; and 4) made an RFC assessment not supported by substantial evidence. (Pl.'s Mem. at 13-14). The defendant argues that the ALJ correctly found that the plaintiff's neurocognitive disorder was nonsevere, reasonably found that the plaintiff's impairments did not

meet or medically equal Listings 12.02 or 12.04, properly evaluated Dr. Spellmann's opinions, and crafted an RFC supported by substantial evidence. (Def.'s Mem. at 2).

A.   THE SEVERITY OF THE PLAINTIFF'S NEUROCOGNITIVE DISORDER

The plaintiff argues that the ALJ should have found that her neurocognitive impairment was a severe impairment that met Listing 12.02. (Pl.'s Mem. of Law at 13, 16).[5]

The plaintiff bears the burden of establishing that an impairment is severe. *See Woodmancy v. Colvin*, 577 F. App'x 72, 74 (2d Cir. 2014) (summary order) (citing *Green-Younger v. Comm'r*, 335 F.3d 99, 106 (2d Cir. 2003)). In order for an impairment to be severe, the impairment must "significantly limit[] [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). In other words, the impairment must have "more than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities[.]" Social Security Ruling ["SSR"] 85-28, 1985 WL 56856, at *3 (S.S.A. Jan. 1, 1985). Moreover, an impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509.

Here, the ALJ acknowledged the plaintiff's testimony that she suffered a pseudo-stroke in 2011, which "killed" her short-term memory. (Tr. 15). The ALJ, however, then found that the record showed no ongoing deficits related to this incident, with "cognitive testing within normal

---

[5] Listing 12.02 deals with neurocognitive disorders. Neurocognitive disorders are "characterized by a clinically significant decline in cognitive functioning," evidenced by "disturbances in memory, executive functioning . . . , visual-spatial functioning, language and speech, perception, insight, judgment, and insensitivity to social standards." § 12.00(B)(1)(a). To meet Listing 12.02, an individual must show medical documentation of a significant cognitive decline from a prior level of functioning in one or more of the cognitive areas of complex attention, executive function, learning and memory, language, perceptual-motor, or social cognition. *See* § 12.02(A). The individual must then show that either § 12.02(B) or § 12.02(C) is met. To satisfy § 12.02(B), the individual must show an extreme limitation, or marked limitation of two, of the following areas of mental functioning: 1) understanding, remembering and applying information; 2) interacting with others; 3) concentrating, persisting or maintaining pace; or 4) adapting or managing oneself. To satisfy § 12,02(C), the individual must show that the mental disorder is "severe and persistent," with evidence of both 1) medical treatment, mental health therapy, psychosocial supports or a highly structed setting that is ongoing and that diminishes the symptoms and signs of the mental disorder; and 2) marginal adjustment, which is "minimal capacity to adapt to changes in . . . environment or to demands that are not already part of [the individual's] daily life."

limitations." (*Id.*). He stated that the plaintiff "functions independently while her husband works outside the home," including driving. (*Id.*). Thus, though "Dr. Spellmann listed neurocognitive disorder as a diagnosis, the record d[id] not support any deficits in cognitive functioning," and accordingly, the ALJ found her disorder to be nonsevere. (*Id.*). The ALJ also cited the state agency medical consultants' opinions, Drs. Janine Swanson and Hedy Augenbraun, who each found the plaintiff's neurocognitive disorder to be nonsevere. (Tr. 100-01, 114-15).

Substantial evidence supports the ALJ's finding. The relevant period at issue is August 28, 2014 to December 31, 2016. Though the plaintiff suffered a "pseudo-stroke" in 2011, the record does not reflect that any limiting effects of that event continued into the relevant period. Indeed, a psychological consultative examination from June 2014—shortly before the relevant period—revealed that "her speech issue ha[d] completely resolved without any sequelae" and her "[l]ong-term memory apparently [was] fine," though she "complain[ed] of having problems with [her] short-term memory" and "word finding difficulty on occasion." (Tr. 996). On examination, her speech was clear, she had no sensory or motor deficits, and she had three out of three object recall. (Tr. 997). Her "mentation [was] normal." (*Id.*). Further, treatment notes from the relevant period reflected normal attention span, intact short term and remote memory, average intelligence, average fund of knowledge, and orientation to person, place and time. (*See* Tr. 1310-12 (August 11, 2014); Tr. 1314-16 (October 31, 2014); Tr. 1318-19 (December 26, 2014); Tr. 1322-24 (January 9, 2015); Tr. 1326-27 (December 23, 2014); Tr. 1330-31 (January 19, 2016); Tr. 1333-35 (February 16, 2016); Tr. 1338-39 (March 1, 2016); Tr. 1342-43 (April 1, 2016); Tr. 1346-47 (May 3, 2016); Tr. 1350-51 (June 15, 2016); Tr. 1354-55 (July 28, 2016)). Moreover, treatment notes from September 1, 2016 and October 13, 2016 indicated that she had normal speech, normal mental status, and normal memory. (Tr. 1420, 1426).

In support of her argument, the plaintiff cites medical records predating the relevant period (from March 2011- July 2014), medical records from her December 2014 hospitalization and medical records from a period of time postdating the relevant time period (May 2017 to January 2018).

Preliminarily, the medical records from March 2011 through July 2014 do not show a neurocognitive disorder. In November 2011, the plaintiff saw Dr. Stancov, complaining of memory problems and an episode of language disturbance, as well as increased irritability and depression. (Tr. 300-08). Dr. Stancov prescribed medications. (*Id*.). Dr. Stancov noted that the plaintiff's short-term memory was impaired, which she attributed to a stroke in March 2011, but her remote memory was intact. (Tr. 301). The plaintiff continued to see Dr. Stancov for therapy and medication management throughout 2012. At appointments on January 18, 2012 (Tr. 950-51), February 21, 2012 (Tr. 947-49), March 20, 2012 (Tr. 945-46), April 26, 2012 (Tr. 939-42), June 5, 2012 (Tr. 935-37), July 12, 2012 (Tr. 932-33), August 7, 2012 (Tr. 929-30), and October 2, 2012 (926-28), Dr. Stancov noted that the plaintiff's short-term memory was impaired. However, treatment notes from the plaintiff's March 2012 hospital stay reflect that her recent and remote memory and her concentration were all intact. (Tr. 1024, 1028).

Further, the plaintiff returned to Dr. Stancov on January 22, 2013 (Tr. 975-78), February 7, 2013 (Tr. 979-81) May 2, 2013 (Tr. 983-86), and September 24, 2013. (Tr. 987-990). At each of those appointments, on examination, Dr. Stancov noted that the plaintiff's attention span and recent and remote memory was intact.

At the plaintiff's psychological consultative examination from June 2014, Dr. Sekhar C. Chirunnomula indicated that "her speech issue ha[d] completely resolved without any sequelae,"

and her "[l]ong-term memory apparently [was] fine," though she "complain[ed] of having problems with [her] short-term memory" and "word finding difficulty on occasion." (Tr. 996).

At an August 21, 2014 appointment with Dr. Stancov, the plaintiff's attention span was again normal and her remote and recent memory were intact. (Tr. 1005-08).

Additionally, a detailed review of the December 2014 records shows that they do not support the plaintiff's argument. On December 12, 2014, Dr. Aurora Miller, M.D., found that the plaintiff had intact attention span, language and concentration, good fund of knowledge, and orientation to person, place and time. (Tr. 1106). On December 15, 2014, Dr. Jorge Aguilar-Zannata found that the plaintiff's speech was normal, her concentration and attention span was intact, there was "no waxing and waning of concentration," her fund of knowledge was average, and her memory was intact. (Tr. 1113). On December 17, 2014, a provider at Four Winds Hospital found that the plaintiff's speech was "fluent," her attention and concentration was normal, and her short-term, recent past and remote memory were all good. (Tr. 1124-26). The provider noted that her intellectual functioning was above average. (Tr. 1128).

And as to the plaintiff's citation to medical records from "Jan 2018 through April 2018," (Pl.'s Mem. at 18), these records actually refer to the time period of May 2017 to January 2018 and do not reflect any cognitive deficits. (Tr. 1517-1521).

Lastly, the plaintiff argues that Dr. Mark Spellmann's two medical source statements and his hearing testimony support her argument. In his December 2016 medical source statement, Dr. Spellmann diagnosed the plaintiff with major neurocognitive disorder. (Tr. 1384). Besides listing major neurocognitive disorder in the "Diagnoses" section, Dr. Spellmann did not further elaborate on this diagnosis. (Tr. 1384). To this statement, however, he attached a five-page statement, in which he opined that her "concentration and planning abilities vary," but there was "[n]o evidence

of major memory problems or disorientation." (Tr. 1392). In that statement, Dr. Spellmann provides a history of the plaintiff's depression and manic episodes beginning when she first saw a psychiatrist at age 18. He mentions that the plaintiff "suffered an acute organic brain syndrome (OBS) which included a rapid onset of aphasia and delirium" in March 2011. (Tr. 1390). He does not, however, otherwise discuss any other memory, language or attention problems. Moreover, neither Dr. Spellmann's June 2017 medical source statement nor his treatment notes for that statement referenced neurocognitive disorder or any cognitive deficits. Dr. Spellmann attached that same five-page statement to his June 2017 medical source statement. Finally, at the hearing before the ALJ, when asked whether the plaintiff suffered from any mental health conditions, Dr. Spellmann did not mention neurocognitive disorder. (Tr. 59).

Thus, substantial evidence supports the ALJ's decision to find the plaintiff's neurocognitive disorder nonsevere. Accordingly, the plaintiff's argument that the ALJ should have found that her neurocognitive disorder met Listing 12.02 must also fail. Because the plaintiff failed to show that she had a severe neurocognitive disorder, she similarly did not show "medical documentation of a significant cognitive decline from a prior level of functioning in one or more of the cognitive areas of complex attention, executive function, learning and memory, language, perceptual-motor, or social cognition." *See* § 12.02(A). Therefore, substantial evidence supports the ALJ's findings that the plaintiff's neurocognitive disorder was not a severe impairment and did not meet the requirements of Listing 12.02.

B.    LISTING 12.04

The plaintiff argues that the ALJ erred in his conclusion that the plaintiff's mental impairments did not meet Listing 12.04. (Pl.'s Mem. at 21-24).[6]

---

[6] The plaintiff's memorandum also refers to Listing 12.02 when discussing the plaintiff's bipolar disorder; however, these references appear to be in error. The heading references Listing 12.02, while the argument section analyzes

A Listing 12.04 impairment requires the plaintiff's disorder to meet the severity levels of both § 12.04(A) *and* either § 12.04(B) or § 12.04(C). To meet the § 12.04(A) criteria, the plaintiff must provide medical documentation of 1) depressive disorder, characterized by five or more of the following: depressed mood; diminished interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; observable psychomotor agitation or retardation; and decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; or thoughts of death or suicide; or 2) bipolar disorder, characterized by three or more of the following: pressured speech; flight of ideas; inflated self-esteem; decreased need for sleep; distractibility; involvement in activities that have a high probability of painful consequences that are not recognized; or increase in goal-directed activity or psychomotor agitation. Here, the ALJ did not specifically discuss § 12.04(A). (Tr. 14-15). Instead, the ALJ analyzed §§ 12.04(B) and 12.04(C) and found that, because the plaintiff's mental impairments did not meet the criteria of either subsection, she did not have an impairment that met or medically equaled Listing 12.04.

The ALJ did not err in this analysis. To meet the § 12.04(B) criteria, a plaintiff must have at least two "marked" limitations or one "extreme" limitation in the four following areas: (1) understanding, remembering, and applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. Limitations can be "extreme," "marked," "moderate," or "mild." "Extreme" is defined as an inability to function in the area "independently, appropriately, [and] effectively, on a sustained basis."

---

Listing 12.04, with an incorrect cite to Listing 12.02. (*See* Pl.'s Mem. at 21-22). Listing 12.02 is for neurocognitive disorders, and Listing 12.04 is for depressive, bipolar and related disorders. The plaintiff may be incorrectly citing to an older version of the listing not applicable in this case. *See* 20 C.F.R. Pt. 404, Subpt. P., Appendix 1 (effective March 14, 2018) ("The listings for mental disorders are arranged in 11 categories: Neurocognitive disorders (12.02); . . . depressive, bipolar and related disorders (12.04) . . ."); Pl.'s Mem. at 2 (incorrectly citing 12.02 as "Organic Mental Disorders"). In any event, as discussed above, the ALJ's finding of nonseverity as to the plaintiff's neurocognitive disorder is supported by substantial evidence. Accordingly, the ALJ did not err by not discussing whether the plaintiff had an impairment that met or medically equaled Listing 12.02 (Neurocognitive Disorders).

§ 12.00(F)(2)(e). "Marked" is defined as a "serious" limitation on an individual's ability to function in the area "independently, appropriately, [and] effectively, on a sustained basis." § 12.00(F)(2)(d). A "moderate" limitation occurs where an individual's "functioning in this area independently, appropriately, effectively, and on a sustained basis" is "fair." § 12.00(F)(2)(c). A "mild" limitation is defined as a "slight" limitation on an individual's ability to function in the area "independently, appropriately, effectively, and on a sustained basis." § 12.00(F)(2)(b). The plaintiff bears the burden of demonstrating that the impairment meets "all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990).

In his decision, the ALJ first found that the plaintiff had "mild" limitations in understanding, remembering, or applying information. (Tr. 16). In support of this conclusion, the ALJ stated that the "record does not demonstrate any significant or sustained loss of cognitive functioning," and "[t]here is no evidence to show significant limitations with [her] ability to understand and follow at least short and simple tasks." (*Id.*). Her ability to "follow simple instructions and carry out tasks" is "evidenced by her ability to relate her medical history to medical providers" and her reports of "performing independent daily activities," including using a computer and driving. (*Id.*). Substantial evidence supports this finding. State agency psychological consultants found that the plaintiff had mild limitations in this area. (*See* Tr. 100, 115). Moreover, as noted above, treatment notes from the relevant period reflect intact short term and remote memory, average intelligence, and average fund of knowledge. (*See* Tr. 1310-12 (August 11, 2014); Tr. 1314-16 (October 31, 2014); Tr. 1318-19 (December 26, 2014); Tr. 1322-24 (January 9, 2015); Tr. 1326-27 (December 23, 2014); Tr. 1330-31 (January 19, 2016); Tr. 1333-35 (February 16, 2016); Tr. 1338-39 (March 1, 2016); Tr. 1342-43 (April 1, 2016); Tr. 1346-47 (May 3, 2016); Tr. 1350-51 (June 15, 2016); Tr. 1354-55 (July 28, 2016)). Treatment notes from

September 1, 2016 and October 13, 2016 reflect normal memory. (Tr. 1420, 1426). Finally, Dr. Spellmann opined in December 2016 that there was "[n]o evidence of major memory problems or disorientation." (Tr. 1392).

Second, the ALJ found that the plaintiff had "moderate limitations" in interacting with others. (Tr. 16). Substantial evidence supports the ALJ's finding that the plaintiff did not have a marked or serious limitation in this area. The plaintiff has pointed to nothing in the medical records indicating that she had a marked or extreme limitation in this area. The state agency psychological consultants opined that she had only mild limitations in this area. (Tr. 100, 115). Further, Dr. Spellmann opined in December 2016 that she had an average ability in interacting appropriately with others, a reduced ability in asking questions or requesting assistance, an average ability in responding appropriately to others in authority, and a reduced ability in getting along with others without distracting them or exhibiting behavioral extremes. (Tr. 1387). Finally, the plaintiff reported that she could go grocery shopping and "downtown" with her husband. (Tr. 55, 57). She also traveled to Thailand and to Phoenix to visit her son. (Tr. 54).

Third, the ALJ found that the plaintiff had "moderate" limitations regarding concentrating, persisting, or maintaining pace. (Tr. 16). The ALJ stated that the plaintiff had "some limitations in maintaining concentration and focus." (*Id.*). The ALJ noted that the plaintiff reported "poor concentration and focus," but also "function[ed] independently when her husband [was] working." (*Id.*). The ALJ found that the "record supports no more than moderate limitations in this functional area given the [plaintiff's] reported abilities." (*Id.*). Substantial evidence supports this finding. As noted above, the plaintiff's treatment notes from her treating psychiatrists and other physicians reflect normal attention span, average intelligence, and orientation to person, place and time. (*See* Tr. 1310-12 (August 11, 2014); Tr. 1314-16 (October 31, 2014); Tr. 1318-19 (December 26,

2014); Tr. 1322-24 (January 9, 2015); Tr. 1326-27 (December 23, 2014); Tr. 1330-31 (January 19, 2016); Tr. 1333-35 (February 16, 2016); Tr. 1338-39 (March 1, 2016); Tr. 1342-43 (April 1, 2016); Tr. 1346-47 (May 3, 2016); Tr. 1350-51 (June 15, 2016); Tr. 1354-55 (July 28, 2016)). On December 12, 2014, Dr. Miller found that the plaintiff had intact attention span, language and concentration, as well as orientation to person, place and time. (Tr. 1106). On December 15, 2014, Dr. Aguilar-Zannata found that the plaintiff's concentration and attention span was intact; there was "no waxing and waning of concentration." (Tr. 1113). On December 17, 2014, a provider at Four Winds Hospital found that her attention and concentration was normal (Tr. 1124-26). Moreover, Dr. Swanson opined that the plaintiff had only "mild" limitations in this area, (Tr. 100), and Dr. Augenbraun opined that she had "moderate" limitations. (Tr. 115). Finally, Dr. Spellmann opined in December 2016 that she had better than average (or infrequent problems) in all areas of task performance, (Tr. 1387), though in his later statement he opined that she had average ability in carrying out single-step instructions and changing from one simple task to another, but reduced ability in performing basic activities at a reasonable pace and limited ability in carrying out multi-step instructions and focusing long enough to finish simple activities. (Tr. 1462).

Finally, the ALJ found that the plaintiff had "mild" limitations in adapting or managing oneself. (Tr. 16). The ALJ acknowledged that the plaintiff "report[ed] being able to care for her own personal needs[,] such as maintaining personal hygiene, grooming, and appropriate dress." (Tr. 16). Moreover, the ALJ found that "[t]he evidence d[id] not show that the [plaintiff] had a significant loss of her ability to regulate emotions, control, behavior, and maintain well-being in a work setting (e.g. no findings for persistent emotional lability or significant mood fluctuations)." (*Id.*). The ALJ also found that the "record, as well as the [plaintiff's] testimony, establishe[d] that she perform[ed] a wide range of household tasks and c[ould] do so independently (depending on

her mood)." (*Id.*). "The medical evidence d[id] not show that these abilities suffered a significant loss of place[] in a work setting," and the "record d[id] not show that the [plaintiff] had a highly supported environment or that she required significant assistance to maintain adaptive functioning." (Tr. 16-17). Substantial evidence supports this finding. By her own admission, the plaintiff could drive, use a computer, dress and wash herself, shop for groceries, make meals, do laundry, shop online, and travel with her husband for extended periods. (Tr. 54, 55, 248, 251, 252). Moreover, Drs. Swanson and Augenbraun opined that the plaintiff had only mild limitations in this area. (Tr. 100, 115). Dr. Spellmann opined in December 2016 that the plaintiff sometimes had problems with caring for her personal hygiene and her physical needs (e.g. dressing, eating), using appropriate coping skills, and handling frustrating appropriately. (Tr. 1386). Finally, the treatment notes from the plaintiff's treating psychiatrists throughout the relevant period reflect at least fair grooming, hygiene, impulse control, insight and judgment. (*See* Tr. 1310, 1314, 1318, 1322-23, 1326, 1330, 1333-34, 1338, 1342, 1346, 1350, 1354). Accordingly, substantial evidence supports the ALJ's conclusions regarding the § 12.04(B) criteria.

The ALJ next considered the § 12.04(C) criteria. To meet the § 12.04(C) criteria, a plaintiff must have a "serious and persistent" mental disorder; "that is, . . . a medically documented history of the existence of the disorder over a period of at least 2 years," with evidence of *both* 1) "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the] mental disorder . . ."; and 2) "[m]arginal adjustment, that is, [the plaintiff has] minimal capacity to adapt to changes in . . . environment or to demands that are not already part of . . . daily life."

The ALJ found that "[t]he record does not show the [plaintiff] satisfies the 'paragraph C' criteria." (Tr. 17). He did not otherwise articulate his reasons.

"[T]he absence of an express rationale does not prevent [a court] from upholding the ALJ's determination." *Berry v. Schweiker*, 675 F.2d 464, 468-69 (2d Cir. 1982) (per curiam). Indeed, a remand is not warranted where the Court is able to "look to other portions of the ALJ's decision and to clearly credible evidence in finding that [the] decision was supported by substantial evidence." *Id.* at 469; *see Howarth v. Berryhill*, No. 16-CV-1844 (JCH), 2017 WL 6527432, at *7 (D. Conn. Dec. 19, 2017) (citing *Fischer-Ross v. Barnhart*, 431 F.3d 729, 735 (10th Cir. 2005) (applying harmless error to the ALJ's failure to articulate his reasoning where the ALJ's findings elsewhere, "coupled with indisputable aspects of the medical record," indicate that "[n]o reasonable factfinder could conclude otherwise"). Where, however, the Court is "unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required," it does "not hesitate to remand the case for further findings or a clearer explanation for the decision." *Berry*, 675 F.2d at 468.

Here, applying § 12.04(C)'s two-prong test, medical records evidence that the plaintiff suffered from her mental impairments for more than two years, that they caused at least minimal limitation in her ability to work, and that she received medical treatment, mental health therapy and psychological support. The plaintiff has thus shown the existence of a "serious and persistent" mental disorder. To meet the § 12.04(C) criteria, however, the plaintiff must show the existence of both a "serious and persistent" mental disorder and marginal adjustment. The issue here is whether the plaintiff met the marginal adjustment requirement. A plaintiff has achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of symptoms and signs and to deterioration in functioning. 20 C.F.R. 404 Subpt. P, App 1, §12.00(g)(2)(c). For example, an individual with only marginal adjustment may "become unable to function outside of [the] home or a more restrictive setting, without substantial

psychosocial supports." (*Id.*). "Such deterioration may have necessitated a significant change in medication or other treatment." (*Id.*). "Similarly, . . . , evidence may document episodes of deterioration that have required [the individual] to be hospitalized or absent from work, making it difficult . . . to sustain work activity over time." (*Id.*).

Upon review of the record, the Court finds that substantial evidence supports the ALJ's conclusion regarding the paragraph C criteria. Preliminarily, the plaintiff's brief does not once mention marginal adjustment, despite its presence being necessary for a finding under paragraph C. The plaintiff reported being able to drive, grocery shop, feed the dog, and do laundry. (*See* Tr. 47, 54, 248, 251, 252). She lived independently with her husband who worked outside the home, and she traveled to Thailand to sightsee and Phoenix to visit her son. (*See* Tr. 47, 54). Further, treatment notes from 2014 to 2016 reflect normal attention span, intact short term and remote memory, average intelligence, average fund of knowledge, and orientation to person, place and time. (*See* Tr. 1310-12; Tr. 1314-16; Tr. 1318-19; Tr. 1322-24; Tr. 1326-27; Tr. 1330-31; Tr. 1333-35; Tr. 1338-39; Tr. 1342-43; Tr. 1346-47; Tr. 1350-51; Tr. 1354-55); *Jeffrey W. Berryhill*, No. 18-CV-115 (LEK), 2019 WL 2210593, at *8 (N.D.N.Y. May 22, 2019) (finding that plaintiff did not meet the paragraph C criteria of "marginal adjustment" based on plaintiff's reported daily activities and medical evidence indicating good concentration, intact memory, normal thought content, and goal oriented thought processes); *Mitchell v. Berryhill*, No. 16-CV-6588, 2018 WL 3300683, at *18 (S.D.N.Y. Feb. 2, 2018) (Report and Recommendation), adopted sub nom., *Mitchell v. Colvin*, 2018 WL 1568972 (S.D.N.Y. Mar. 30, 2018) (finding that plaintiff did not have marginal adjustment where the plaintiff had no restriction in functioning on a daily basis and treatment notes reflected that the plaintiff's mental health status was within normal limits)).

Additionally, while the plaintiff was hospitalized in December 2014 and September 2015, neither of those episodes evidence the existence of marginal adjustment. At the plaintiff's psychiatric intake after the December 2014 suicide attempt and resulting hospital admission, the plaintiff acknowledged that she "[had] not been consistent with taking her medications and felt they were not helping her mood." (Tr. 1120, 1138). She also stated that she had "[n]o current therapist." (Tr. 1130). As noted by the ALJ, the plaintiff's mood stabilized over the course of the admission. (Tr. 1138-40). In September 2015, the plaintiff was treated for a drug overdose. (Tr. 1202). Though the medical records were unclear on whether the plaintiff's overdose was intentional or accidental, the plaintiff stated that she "inadvertently took her medications" and had no suicidal ideation. (Tr. 1217). Finally, both state agency consultants opined that the plaintiff did not meet the paragraph C criteria.

Thus, the ALJ's decision properly concluded that the plaintiff did not meet Listing 12.04. The plaintiff's reported activities, the medical evidence, and the opinions of the state agency consultants provide substantial evidence in support of the ALJ's finding. In light of this evidence, the ALJ's failure to address specifically the paragraph C criteria was harmless error. *See Schildwachter v. Berryhill*, No. 17-CV-7277 (SN), 2019 WL 1116256, at *7 (S.D.N.Y. Feb. 8, 2019) (finding harmless error where the ALJ did not specifically address paragraph C but credible evidence indicated that the plaintiff did not meet the required criteria). Accordingly, remand is not warranted.

C.     DR. SPELLMANN'S OPINIONS

The plaintiff argues that the ALJ afforded improper weight, and did not explain why he gave only some weight, to Dr. Spellmann's opinions.

Substantial evidence supports the ALJ's assessment of Dr. Spellmann's opinions. Dr. Spellmann saw the plaintiff for weekly therapy sessions beginning in May 2015. Dr. Spellmann gave three opinions: a December 11, 2016 medical source statement, a June 22, 2017 medical source statement, and an October 4, 2017 statement in his treatment notes. Only one of these was made during the relevant period for the plaintiff's application for benefits. He also testified at the plaintiff's administrative hearing.

In his December 2016 statement, Dr. Spellmann opined that the plaintiff had a reduced ability to take care of personal hygiene, to care for physical needs, to use appropriate coping skills, and to handle frustration appropriately. (Tr. 1386). She had a limited ability to use good judgment regarding safety and dangerous circumstances. (*Id.*). He also opined that she had average ability to interact appropriately with others and to respond appropriately to others in authority, and she had a reduced ability to ask questions or request assistance and to get along with others without distracting them or exhibiting behavioral extremes. (Tr. 1387). According to Dr. Spellmann, the plaintiff also had better than average or infrequent problems in carrying out single-step and multi-step instructions, focusing long enough to finish simple activities or tasks, changing from one simple task to another, performing basic activities at a reasonable pace, and persisting in simple activities without interruption from psychological symptoms. (*Id.*). Dr. Spellmann also indicated that the plaintiff would need assistance with finances during hypomanic episodes, and that her husband was very capable, responsible and competent in that regard. (Tr. 1388). He then attached a five-page statement outlining the plaintiff's psychiatric treatment history. (Tr. 1389-93). In that statement, he opined that her symptoms "preclude any possibility of her regaining her ability to function professionally for the foreseeable future." (Tr. 1393).

Dr. Spellmann provided another medical source statement in June 2017, approximately six months after the expiration of the date last insured. Dr. Spellmann opined that the plaintiff had a reduced ability to take care of personal hygiene and to care for physical needs, and a limited ability to use good judgment regarding safety and dangerous circumstances, to use appropriate coping skills and to handle frustration appropriately. (Tr. 1461). As to the plaintiff's social interactions, he opined that she had a reduced ability to interact appropriately with others and to get along with others without distracting them or exhibiting behavioral extremes, and a limited ability to ask questions or request assistance and to respond appropriately to others in authority. (Tr. 1462). As to task performance, he opined that she had an average ability to carry out single-step instructions and to change from one simple task to another, a reduced ability to perform basic activities at a reasonable pace, and a limited ability to carry out multi-step instructions, to focus long enough to finish simple activities or tasks, and to persist in simple activities without interruption from psychological symptoms. (*Id.*). He stated that social skills and task performance are "seriously compromised in periods of depression and mania." (*Id.*).

In October 2017, Dr. Spellmann noted that "[t]here is no prospect of [the plaintiff] being able to hold stable employment when she can not reliably expect more than one stable week a month, and when that week will actually occur is unpredictable." (Tr. 1512). At the plaintiff's hearing, he explained that the plaintiff's depressions would last "anywhere from two to four weeks"; then she would have a week of normal mood or she would move into hypomania; hypomania would last a "week and a half or so" and was always followed by "severe depressions." (Tr. 59). Dr. Spellmann opined that the plaintiff would be "disabled by her symptoms anywhere from three to four weeks a month, depending on the duration of the depression." (Tr. 60).

Because Dr. Spellmann is a treating physician, his opinion "as to the nature and severity of the impairment [must be] given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404. 1527(d)(2) [now (c)(2)]). Conversely, a "treating physician's opinion does not get controlling weight when 'other substantial evidence in the record conflicts with the treating physician's opinion.'" *Wright v. Barnhart*, 473 F. Supp. 2d 488, 493 (S.D.N.Y. 2007) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). When the ALJ "do[es] not give the treating source's opinion controlling weight," as happened here, he must "explicitly consider" the factors listed in 20 C.F.R. § 404.1527(c)(2), including (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist. *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam)). Unless after "a searching review of the record" the reviewing court is "assure[d] . . . 'that the substance of the treating physician rule was not traversed,'" the ALJ's failure to apply these factors requires remand. *Estrella*, 925 F.3d at 96 (quoting *Halloran*, 362 F.3d at 32).

Here, the ALJ stated that he "considered the testimony and [the December 2016 and June 2017] medical source statements from Dr. Spellmann." (Tr. 21). He "assign[ed] them some weight, to the extent they [were] consistent with the overall findings." (*Id*.). The ALJ acknowledged that Dr. Spellmann was a treating source, but he found that "his testimony that [the plaintiff's] conditions [were] disabling three to four times per month and that she ha[d] limited ability to function [were] inconsistent with treatment notes showing an overall improvement with no recommendation for a higher level of care." (*Id*.). The ALJ also noted that Dr. Spellmann's

"opinions in support of disability [were] also inconsistent with her ability to travel to Thailand, Arizona and Maine." (*Id.*). Lastly, the ALJ gave no weight to the October 2017 "notation in [Dr. Spellmann's] treatment notes that [the plaintiff] was unable to hold stable employment." (*Id.*). The ALJ found that this statement was not a medical opinion, but an administrative finding dispositive of a case. (*Id.*). As such, the statement was not entitled to any special significant weight. (*Id.*). The ALJ stated that instead, he "relie[d] on the treatment notes [from Dr. Spellmann] showing the [plaintiff] with mild to moderate depressive symptoms with treatment compliance without evidence of the need for a higher level of care (Exhibit B37F and B40F-B42F)." (*Id.*).

The Court's review of the medical records supports the ALJ's finding that Dr. Spellmann's opinions were inconsistent with substantial evidence in the medical records. Treatment notes from the plaintiff's psychiatrists reflect that the plaintiff consistently appeared appropriately dressed, pleasant and cooperative, with normal thought content and goal directed thinking. (Tr. 1310, 1314, 1322, 1326, 1330, 1342, 1346). She had normal attention span, intact short term and remote memory, average intelligence, average fund of knowledge, orientation to person, place and time, and at least fair or good impulse control, insight and judgment. (Tr. 1310, 1314, Tr. 1318, Tr. 1322-23, 1326, 1330, 1334, 1338, 1342, 1346, 1350, 1354). In October 2014, the plaintiff reported being "unable to function at home" due to depression; she had been spending most of her time "on the couch." (Tr. 1313). Her functioning was "low" despite taking her prescribed medication. (*Id.*). Dr. Stancov noted that her depression and anxiety "worsened," and she had "increased suicidal ideation." (*Id.*). Dr. Stancov spoke to her about hospitalization, and the plaintiff agreed to go to the emergency room if her symptoms worsened. (Tr. 1315).

In December 2014, the plaintiff saw Dr. Yung Park, M.D.,[7] after spending time in the hospital for a suicide attempt. (Tr. 1317). The plaintiff had taken "about 20 tablets each" of Trazodone, Bupropion and Vibryd along with a bottle of wine. (*Id*.). Immediately after ingesting the pills, the plaintiff "realized it was a stupid thing" and called 911 and Dr. Stancov. (*Id*.). At the plaintiff's psychiatric intake after the December 2014 suicide attempt and resulting hospital admission, the plaintiff acknowledged that she "[had] not been consistent with taking her medications and felt they were not helping her mood." (Tr. 1120, 1138). The plaintiff's mood stabilized over the course of the admission, (Tr. 1138-40), and at her December 2014 appointment with Dr. Park, she felt "better" and denied suicidal ideation. (Tr. 1317).

In January 2015, the plaintiff returned to Dr. Stancov. (Tr. 1321). She reported being "very depressed, but not suicidal." (*Id*.). Treatment notes reflect that she was "unable to function at home" and "spen[t] most time on the couch." (*Id*.). She had started therapy. (Tr. 1323). The plaintiff's next appointment with Dr. Park was not until December 2015, at which time she reported "feeling 'fine'" and denied any "depressive, anxious, manic/hypomanic or psychotic symptoms." (Tr. 1325). She had been finding her medications that she had been on for "the past 2 months" "fully effective." (Tr. 1325). Her mood was euthymic and "fine." (Tr. 1326).

In January 2016, the plaintiff reported feeling "anxious"; her daughter had left for South Africa for a semester abroad, her son was detonating bombs in Cambodia, and her father was very ill. (Tr. 1329). Treatment notes reflect that she "continue[d] to take all her psychotropics on a daily basis without notice of any side effects." (*Id*.). In February 2016, the plaintiff reported "feeling a little hypomanic with completing goal-oriented tasks and ongoing issues with sleep." (Tr. 1333). In March 2016, the plaintiff reported "feeling 'hyper,'" "increased energy," "going on spending

---

[7] Dr. Stancov and Dr. Park are both providers at Western Connecticut Medical.

sprees," and "feeling impulsive." (Tr. 1337). In April 2016, the plaintiff stated that she had been feeling "good" but could not sleep without Seroquel. (Tr. 1341). She denied any depressive, anxious, manic/hypomanic or psychotic symptoms. (*Id*.). In May 2016, the plaintiff felt "great," but she still had trouble sleeping without Seroquel. (Tr. 1345). She denied any depressive, anxious, manic/hypomanic or psychotic symptoms. (*Id*.). She was excited to spend three weeks in Washington, D.C., with her daughter. (*Id*.). She had also "noticed improvement in her mood and anxiety." (*Id*.). In June 2016, the plaintiff again reported that she had been feeling "good" and denied any depressive, anxious, manic/hypomanic or psychotic symptoms. (Tr. 1349). She had noticed improvement in her mood, anxiety and sleep. (*Id*.). In July 2016, the plaintiff reported that she had been feeling "down for the past two days with sleeping issues since [she] stopped taking Seroquel . . . and now [she] ha[d] gained a lot of weight." (Tr. 1353). Her main stressor was "finding out that she ha[d] a GI bleed because [her] hemoglobin went down" and she now had "a lot of doctors' appointments." (*Id*.). She denied any other depressive, anxious, manic/hypomanic or psychotic symptoms. (*Id*.). Her mood was euthymic and "good." (Tr. 1354).

Thus, a review of the psychiatrists' treatment notes does not reveal limitations to the extent opined by Dr. Spellmann, i.e., that the "[the plaintiff's] conditions [were] disabling three to four times per month and that she ha[d] limited ability to function." Specifically, nothing in the medical records suggests that the plaintiff could not perform simple, routine repetitious work that did not require teamwork or working closely with the public and required only occasional interaction with coworkers, supervisors and the public. The ALJ thus did not erroneously find that Dr. Spellmann's opinions were inconsistent with the medical evidence. (Tr. 21). Therefore, the ALJ was entitled to give Dr. Spellmann's opinions less than controlling weight.

Moreover, Dr. Spellmann's December 2016 medical source statement does not support his opinion that the plaintiff was disabled three to four times a month.[8] Indeed, in December 2016, Dr. Spellmann opined that the plaintiff had better than average ability to carry out single-step and multi-step instructions, to focus long enough to finish simple activities or tasks, to change from one simple task to another, to perform basic activities at a reasonable pace, and to persist in simple activities without interruption from psychological symptoms. (Tr. 1387). He also opined that the plaintiff had average ability to interact appropriately with others and to respond appropriately to others in authority. Dr. Spellmann described the plaintiff as having only "mild to moderate" depressive episodes and "moderately severe" hypomanic episodes. (Tr. 1392). He acknowledged that "[h]igher-level care [was] currently not being considered." (*Id*.).

Finally, the ALJ did not err by giving Dr. Spellman's October 2017 notation that the plaintiff was "unable to work" no weight. This statement is reserved to the Commissioner, and thus is not entitled to any weight or special significance. *See* 20 C.F.R. § 404.1527(d)(a) (an opinion concerning the ultimate issue of disability under the Social Security Act is reserved to the Commissioner); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."); Social Security Ruling (SSR) 96-5p, 1996 WL 374183 (treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight).

Accordingly, the ALJ did not err in his treatment of Dr. Spellmann's opinions.

---

[8] Though not addressed by the ALJ, Dr. Spellmann's June 2017 medical source statement has limited probative value. The statement describes the plaintiff's functioning six months after her date last insured; it does not appear to refer to the relevant period, except as already noted in his December 2016 medical source statement. *See Jones v. Sullivan*, 949 F.2d 57, 59-60 (2d Cir. 1991) (upholding rejection of opinions not apparently addressing period prior to date last insured); *Susan M. v. Comm'r of Soc. Sec.*, No. 18-623, 2019 WL 2754480, at *6 (N.D.N.Y. July 2, 2019) (finding opinion not apparently intended to apply to relevant period to have "little probative value").

D.   RFC ASSESSMENT

The plaintiff argues that the RFC is not supported by substantial evidence. The plaintiff does not contest the physical portion of the RFC. Instead, she appears to be arguing that the ALJ should have found that the plaintiff would be off-task for twenty percent of the workday and unexpectantly absent from work for more than once a month. (Pl.'s Mem. at 24-27).

The plaintiff's RFC is "the most she can still do despite her limitations" and is determined "based on all the relevant evidence in [the] case record[,]" namely, "all of the relevant medical and other evidence." 20 C.F.R. § 404.1527(a)(1), (3); *see also Gonzales v. Berryhill*, No. 3:17-CV-1385 (SALM), 2018 WL 3956495, at *14 (D. Conn. Aug. 17, 2018). "[A]n individual's RFC 'is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting Social Security Ruling ["S.S.R."] 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996)). Before classifying a plaintiff's RFC based on exertional level, an ALJ "must first identify the individual's functional limitations or restrictions and assess [] her work-related abilities on a function-by-function basis[]." *Id.* (internal quotation marks omitted).

However, "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the court] to glean the rationale of an ALJ's decision[.]'" *Id.* at 178 n.3 (citing *Mongeur*, 722 F.2d at 1040). "This court must affirm an ALJ's RFC determination when it is supported by substantial evidence in the record." *Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (citing 42 U.S.C. § 405 (g)) (summary order); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Here, as discussed above, the ALJ concluded, after careful consideration of the entire record, that the plaintiff had the RFC to perform light work, but with the following physical

limitations: she could occasionally bend, balance, twist, squat, kneel, crawl, and climb; she could

not climb ladders, ropes or scaffolds; should could not use left foot controls; and she needed to

avoid hazards such as heights, vibrations and dangerous machinery, though she could drive. (Tr.

17). She also was limited to performing simple, routine repetitious work that did not require

teamwork or working closely with the public and required only occasional interaction with

coworkers, supervisors and the public. (*Id*.). The ALJ concluded that the plaintiff could perform

jobs that existed in significant numbers in the national economy, specifically, the following

occupations: electronics worker, assembler, and janitor. (Tr. 22-23).

The ALJ's RFC assessment is supported by substantial evidence. The ALJ's findings are

supported by the treatment notes, the opinions of Dr. Spellmann, and the opinions of the state

agency consultants Drs. Swanson and Augenbraun.

First, as discussed above, the treatment notes were consistent with the level of functioning

the ALJ assessed in his decision. Nothing in the treatment notes suggests that the plaintiff could

not perform simple, routine repetitious work that did not require teamwork or working closely with

the public or that she could not perform an occupation with only occasional interaction with

coworkers, supervisors and the public. The plaintiff consistently appeared appropriately dressed,

pleasant and cooperative, with normal thought content and goal directed thinking. (Tr. 1310, 1314,

1322, 1326, 1330, 1342, 1346). She had normal attention span, intact short term and remote

memory, average intelligence, average fund of knowledge, orientation to person, place and time,

and at least fair or good impulse control, insight and judgment. (Tr. 1310, 1314, Tr. 1318, Tr.

1322-23, 1326, 1330, 1334, 1338, 1342, 1346, 1350, 1354). Her symptoms improved with

medication and therapy. (Tr. 1325-26, 1333, 1337, 1341, 1345, 1349, 1353-54).

Additionally, the RFC assessment is supported by the opinion of Dr. Spellmann, the plaintiff's treating psychologist, to which the ALJ gave "some" weight. Indeed, in December 2016, Dr. Spellmann opined that the plaintiff had better than average ability to carry out single-step and multi-step instructions, to focus long enough to finish simple activities or tasks, to change from one simple task to another, to perform basic activities at a reasonable pace, and to persist in simple activities without interruption from psychological symptoms. (Tr. 1387). Dr. Spellman's opinion is thus consistent with the portion of the RFC limiting the plaintiff to simple, routine, repetitious work. Dr. Spellmann also opined that the plaintiff had an average ability to interact appropriately with others and to respond appropriately to those in authority, and a reduced ability to ask questions or request assistance and to get along with others without distracting them or exhibiting behavioral extremes. (*Id.*). The ALJ acknowledged these limitations and incorporated them into the RFC, limiting the plaintiff to work which did not require teamwork or working closely with the public and which required only occasional interaction with coworkers, supervisors and the public.

The ALJ's RFC assessment is also supported by the opinions of state agency psychological consultants Drs. Swanson and Augenbraun. The ALJ gave these opinions "probative" weight. Dr. Swanson opined that the plaintiff's mental impairments were nonsevere. (Tr. 100). Dr. Augenbraun found that the plaintiff's mental impairments were severe, but they did not meet a listing. (Tr. 114-15). Dr. Augenbraun opined that the plaintiff did not have understanding and memory limitations, but she did have sustained concentration and persistence limitations. (Tr. 118). He also opined that she was not significantly limited in her ability to carry out very short and simple instructions, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracting by them, and to

make simple work-related decisions. (Tr. 118-19). According to Dr. Augenbraun, the plaintiff was moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*). The ALJ similarly incorporated these limitations into the RFC.

The ALJ thus accounted for the plaintiff's mental limitations in the RFC by concluding that she was limited to simple, routine repetitive work that did not require teamwork or working closely with the public and required only occasional interaction with coworkers, supervisors and the public. This Court will "set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence. *Balsamo*, 142 F.3d at 79; *see also Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir.) (summary order) ("[W]hether there is substantial evidence supporting the [plaintiff's] view is not the question here; rather, we must decide whether substantial evidence supports the ALJ's decision"). Therefore, as discussed above, the Court finds that substantial evidence supports the RFC, and remand is not warranted.

VI.    CONCLUSION

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 11) is DENIED. The defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 22) is GRANTED.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

Dated this 23rd day of July, 2020 at New Haven, Connecticut.

 _/s/Robert M. Spector, USMJ_
Robert M. Spector
United States Magistrate Judge